ALPHA PORTLAND CEMENT CO. et al. v. SHIRK.

(Circuit Court of Appeals, Seventh Circuit. October 5, 1915.)

Nos. 2216, 2260.

1. VENDOR AND PURCHASER �kö_130—PERFORMANCE OF CONTRACT—MARKETABLE TITLE.

The fact that an abstract of title shows a chain of conveyances under which a vendor claims, extending back a sufficient time to give title by prescription, does not make the title so shown a marketable one; lapse of time being only one of the elements necessary to give title by prescription.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 245–247; Dec. Dig. ⊜⟞130.

Marketable title, see note to New York Life Ins. Co. v. Lord, 40 C. C. A. 592.]

2. VENDOR AND PURCHASER ⊜⟞112—PERFORMANCE OF CONTRACT—PARTIAL FAILURE OF TITLE.

Under a contract for the sale and conveyance by good and marketable title of tracts of mineral land to be used together for the purposes of a cement plant, failure in title to any material part of the land releases the purchaser from the obligation of the contract.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 199, 200; Dec. Dig. ⊜⟞112.]

3. VENDOR AND PURCHASER ⊜⟞130—PERFORMANCE OF CONTRACT—MERCHANTABLE TITLE.

An equitable title is not a merchantable title as between vendor and purchaser.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 245–247; Dec. Dig. ⊜⟞130.]

4. VENDOR AND PURCHASER ⊜⟞113—CONTRACT FOR SALE OF STONE LAND—REPRESENTATIONS AS TO QUANTITY AND QUALITY OF DEPOSIT.

Examination by the purchaser of land containing a limestone deposit under a contract for its sale and purchase for the purpose of establishing Portland cement works *held* such as contemplated by the contract, and to have demonstrated that the land did not contain the quantity and quality of limestone required by the contract to bind the purchaser to complete the purchase.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 201; Dec. Dig. ⊜⟞113.]

Appeal from the District Court of the United States for the District of Indiana; Albert B. Anderson, Judge.

Suit in equity by the Alpha Portland Cement Company and Fannie B. Gerstell, as administratrix, against Elbert Walker Shirk, with cross-bill by defendant. From a decree dismissing both bill and cross-bill, both parties appeal. Affirmed on defendant's appeal, and reversed on complainants' appeal.

See, also, 210 Fed. 223.

Appellants filed their bill seeking to establish and foreclose a vendee's lien against certain premises situate in Lawrence and Jackson counties, Ind., constituting a cement manufacturing plant, but not then in operation. The bill alleges that, influenced by representations as to the title and material conditions of said premises as suitable for the purpose of a cement manufacturing plant, appellants, through the individual appellant's decedent, one A. F. Ger-

stell, entered into a contract in writing, dated December 18, 1911, to purchase said plant for the sum of $150,000 from appellee, who represented himself as the owner thereof. By the terms of the contract appellants were to pay $25,000 down and the balance as therein provided. The property in Lawrence county, appellee claimed, consisted of 312 acres containing limestone, and that in Jackson county consisting of 30 acres, more or less, containing shale—both limestone and shale being required in the manufacture of Portland cement. The balance of the plant contracted for consisted of all the implements, machinery, and appurtenances of every description used in connection with the operation of a cement factory. The contract also covered all desired existing contracts inuring to the benefit of appellants, not including claims for moneys or damages. The foregoing property was to be free from all liens, claims, or incumbrances of any kind whatsoever arising either in law or equity. Gerstell was therein given time until March 1, 1912, to examine title and contents of the said lands to ascertain whether appellee's title was good and merchantable, and whether the limestone was of the quality, conditions, and extent thereinafter set out.

Clause 7 of the contract, so far as material here, reads as follows, viz.: "It is also understood and agreed between the parties that unless the tract of land in Jackson county, Ind., described in paragraph 2 above named, shall contain a deposit of shale suitable for the manufacture of cement, sufficient to supply the requisite amount of shale for a cement mill with a capacity of 2,000 barrels of cement per day for a period of 50 years; and unless the quality of limestone deposit contained on the land named in paragraph 1 above shall average at least 90 per cent. carbonate of lime, and unless the strata of dolomite or magnesia stone contained in said stone deposit shall together average an aggregate thickness of less than 3 feet, and unless the burden of clay or material lying above the limestone shall average in height not over 8 per cent. of the total height of the quarry from the present bottom level thereof to the extreme upper surface of the land, and unless the limestone is approximately coextensive in area with all that portion of said premises which lies on a level above the present bottom of the present quarry as it now exists, the party of the second part may, at his option, by written notice to said first party, stating wherein the premises fail to meet the requirements in this paragraph 7 contained, but only at any time before March 1, 1912, refuse to accept the property named in this agreement and the sum of $25,000 shall thereupon be repaid by said first party to said second party. It is understood that the character and extent of the formation of the limestone is to be determined by drilling, that the cost of said drilling is to be paid by the party of the second part, and that the party of the first part agrees to permit the party of the second part, his agents and representatives, to go upon the premises at any time, and at all times, up to March 1, 1912, for the purpose of inspecting the same or any of the property located thereon, and for making drillings thereon. It is understood, however, that the party of the first part is entitled to be notified of such drilling, so that he may inspect all the cores and materials removed from all the drillings and take samples thereof. And the party of the first part hereby covenants and agrees, upon payment to him of the consideration hereinbefore named, to convey the property described in paragraphs 1 and 2 hereof, to the party of the second part, in fee simple, clear of all incumbrances whatsoever, by a good and sufficient warranty deed, and also to execute such bills of sale or other conveyances or assignments of the personal property named in paragraphs 3 and 4 hereof as the said second party shall reasonably require. The party of the first part is to furnish to the party of the second part, within 10 days from the date hereof, good and sufficient abstracts of the title to the lands hereinbefore named, at his own expense, brought down to date, which shall show a good and merchantable title in the party of the first part."

Gerstell, it is further stipulated, promised, subject to the foregoing agreement, that if the title to the property, real and personal, was in appellee free and clear of all incumbrances whatsoever, he would complete the payment of the purchase price. On such payments being made, appellee agreed to deliver to Gerstell good and sufficient deeds, bills of sale, and assignments of said property. In case of material defects or objections to the title to the

said lands, appellee had 60 days to cure the same after written notice thereof. If these were not cured in 60 days, Gerstell might elect to take the title as it was, or require repayment of the $25,000 and reimbursement for reasonable expenses incurred in the inspection and examination of the property and the title thereto, whereupon appellee should be released from liability under the contract. Time was made the essence of the contract. Provision was also made for the forfeiture of the $25,000 in case Gerstell failed to carry out his payments as agreed.

The said bill thereupon alleges that Gerstell, acting for corporation appellant, paid the $25,000 in pursuance of the contract "on account of the purchase price of said land"; that appellee furnished abstracts of title, but that these did not show good and merchantable title to said lands in himself; that an examination of the record title, in addition to what was shown by the abstracts, made at large expense and in various places, disclosed that appellee did not have good and merchantable titles to said lands free from all liens and incumbrances, or that the same aggregated 312 acres in Lawrence county, but only 267.45 acres, or that the said shale tract aggregated 30 acres, but only 26 acres; that by reason of the fact that, at the time of the conveyance to it of a portion of said premises, one of the parties, through whom the title thereto came being a foreign corporation, viz., the Midland Portland Cement Company, had not complied with the Indiana law authorizing it to do business or own real estate in that state, the title to said portion had escheated; that certain other portions of said land did not appear to have been properly conveyed from the government, for the reason that the patent was not properly executed; that the title to a portion thereof derived through one Wm. Humston, is at best only an equitable title; that certain preferred stockholders of the Midland Portland Cement Company, through whom appellee's title comes, have outstanding liens of record against said Lawrence county lands; that as to a portion of said lands, there appears of record doubt as to whether one John Borland, through whom appellee claims, conveyed a good title by his deed to one Mallott; that the title to a 16-foot strip along the western boundary of a certain 19.3-acre tract of said land, excepted from the conveyance by one Day to one Glover, was still outstanding in Elizabeth Day; that the title to a portion of said premises comes through one John Borland, who devised it to Matthew Borland, who never conveyed it; that the record shows that the several lots or tracts of said land were mortgaged by one Richard Evans to the state of Indiana, and later conveyed by the state of Indiana to William M. Humston through partition proceedings of whose land appellee claims, but no record appears of conveyance of the fee by Evans; that there exists in favor of certain Rariden heirs an expressly reserved vendor's lien taken as an indemnity on May 31, 1906, against liens resting upon lands taken in part payment of the purchase price of said premises by the United States Cement Company, through whom appellee claims title, which liens are not shown to be released of record; that the sale of said premises, except the Rariden tract, by the Midland Portland Cement Company to the United States Cement Company in May, 1904, was made without the consent of owners of 3,435¼ shares of the common stock of the company, giving their names; that the sale was ineffective against such stockholders, said sale being an attempted dissolution of said company and illegal; that one Walls, wife of H. H. Walls, has a one-third interest in certain of the tracts of land covered by the contract, not having joined her husband in his deed as trustee to one Frank Day, dated March 17, 1892, no cestui que trust being disclosed, whereby it is charged Walls individually owned said premises; that said Jackson county land was the property of one James Hamilton, who devised the same to his children; the will was probated, but no executor was appointed; it was not shown of record that his widow's rights have been released in said premises, she having a statutory right to one-third thereof on renouncing the terms of the will; that there was outstanding on said Jackson county land a mortgage to secure $4,000, given by the United States Cement Company to one Andrew F. Robertson on February 5, 1909; that there was no means of access to said Jackson county lands; that one Robertson, who conveyed said Jackson county lands to appellee's predecessors in title reserved and still held the right to all the growing timber on said land, of which there is a large

amount, and to enter thereon for the purpose of removing it. For all of which reasons, the bill alleges, the appellee had not a good and merchantable title, free from all liens and incumbrances, to said premises covered by said contract; that appellee waived his right to correct the title to said land, and agreed to refund said $25,000 and expenses, but has failed to do so.

Appellee, by way of answer to appellants' objections to said title, admits that the Lawrence county tract contains only 267.45 acres, but insists that fact is immaterial, since the contract covers the cement plant by references to other conveyances, etc., and that the same is substantially true of the Jackson county land; charges that the Midland Portland Cement Company had the right under the statute of Indiana to own land for purposes of its business and to convey the same, and denies that title to said land escheated; alleges more than 20, and in some instances more than 80 years' adverse possession of said Lawrence county lands under said alleged defective United States patent; that he and his grantors have been in open and adverse possession of the Humston tracts since the year 1816. The answer denies that he was bound by the terms of his purchase to protect or pay any lien of said preferred stockholders of said Midland Portland Cement Company, or that they held a lien; charges that the same were cut off by mortgage foreclosure; that appellants can protect themselves as to the balance due upon these alleged liens out of the balance due on the present contract; that "defendant is now and always has been ready and willing that said unpaid purchase money to the amount necessary may be applied by plaintiffs to the satisfaction of said lien"; that the apparent outstanding title in John Borland grew out of a mistake in description; that he was about to procure a deed for said 16-foot strip when appellants notified him they would not take the title, irrespective of said strip; that he now owns said strip, and is ready to convey it to appellants; that he and those through whom he claims have been in open and notorious adverse possession of that part of said premises acquired through Thomas J. Francis and William C. Mitchell ever since the year 1852, and that Matthew Borland never had possession thereof, or of any part of it; that the apparent outstanding title in Richard Evans grew out of a misdescription; that appellee's title came through Humston, who, in 1837, was in possession; that Lavinia Humston took possession of said premises under partition decree in 1872, and so remained until 1882, when she conveyed to one under whom appellee claims by mesne conveyances, and that those under whom he claims have had open and adverse possession thereof for more than 40 years; that appellee admits the facts of the Rariden vendee's lien, but that appellants are fully protected by the balance of $425,000 due on the contract, which he is ready and willing to have applied to extinguish those liabilities; that the mortgage to the Security Trust Company of Indianapolis, on January 1, 1902, to secure $500,000 bonds, by the Midland Portland Cement Company, was foreclosed, and appellee acquired title by purchase at that sale, and not exclusively through purchase from the Midland Portland Cement Company's deed; denies that the widow of H. H. Walls has any interest in said premises; says that he has procured a deed from her; that he could have procured it sooner, had appellants' rejection of said title and premises by reason of the quality of stone, etc., not made it unavailing, but is now ready and willing to convey the same to appellants. The answer charges that Rebecca Hamilton has no interest in said premises in Jackson county, because under the then existing statute of Indiana it was her duty to affirmatively elect to take under the statute, instead of under the will, which she did not do; that said land was subject to a $4,000 mortgage to Andrew F. Robertson, which still is a liability to the amount of $2,000, which he would have paid, had appellants not rejected said title, and that he is now ready to discharge the same; that appellants have access to said Jackson county land, all that is required in removing the shale; that the timber reserved by Robertson is small, and only good for firewood, and was an obstruction to the mining and removal of the shale. Appellee thereupon says he was at the time of executing said contract and still is vested with a good and merchantable title in fee simple to said land.

The foregoing is a statement, in substance, of the allegations of the bill and answer as to the several claims of the parties hereto with reference to

the title of said premises. The bill thereupon proceeds as follows in reference to the quantity and quality of the Portland Cement material contained upon said premises, viz., that by paragraph 7 of said contract it was agreed that the carbonate of lime in said limestone rock on said premises in Lawrence county would upon inspection be found to average 90 per cent., whereas it does not average more than 86 per cent., whereby the value of said property for cement manufacturing purposes is greatly reduced; that appellee was duly notified when appellants began drilling cores in said limestone rock and otherwise making examinations of said limestone, and at all times during the progress of said work, so that he might be present or represented for the purpose of verifying such tests; that appellants used due diligence in making said tests and in preserving and making chemical analyses, etc., and in ascertaining the average of carbonate of lime to be not more than 86 per cent.; that they were therefore not bound to proceed with the said purchase; that said property was the only property of appellee liable to execution in said district; that appellants have a lien thereon for the $25,000 paid on account and for expenses incurred, and amounting to $5,039.16, or a total of $30,039.16, with interest, for the enforcement of which appellants pray the decree of the court.

To this portion of the bill appellee answers that appellants did not at first claim that the quantity or quality of limestone suitable, or of dolomite unsuitable, for the manufacture of Portland cement contained in the Lawrence county land, was in any way otherwise than or different from that warranted by the terms of the contract in respect thereto, nor did they make any objection thereto provided the objections to the title were adjusted within the time allowed; that while appellee was remedying such defects as were material, appellants raised the objection to the quantity and quality of the stone and refused to perform; that appellee had advised appellants theretofore that all material defects of title objected to would be cured within the time limited in the contract; that appellants, on February 19, 1912, refused in writing to accept the property and perform said contract and demanded payment of said sum; that the core drill holes were not located with his knowledge and approval; that appellants made no adequate examination of said lands by drilling as required by the contract, or that he was notified of the time and place of the drillings made; that limestone averaged as stated in the contract; that only two holes were drilled, and these at opposite extremities of said Lawrence county land; that whatever was shown by said drillings would not indicate the average thickness of the dolomite or magnesia strata or limestone; that the tests of all kinds were not such as to give a fair average; that the average aggregate thickness of the strata of dolomite was not in excess of 30 feet, or more than 3 feet, and charges that the stone was as represented in the contract; that the carbonate of lime averages 97 per cent.; that appellants did not use due diligence in accumulating and preserving samples of rock and in making analyses; alleges appellee's ability and willingness to perform, and prays that appellants be decreed to specifically perform said contract.

To this answer and cross-bill appellants made reply, denying that appellee ever notified them that he had cured said defects of title and was ready to convey, except in his said answer, and that said defects were not remedied within the time limited in the contract or extension thereof. Appellants introduced various exhibits in support of the allegations of their said bill, which, in the main, support the statements of the bill as to the condition of said title. The abstracts of title in several cases fail to show title in appellee, notably where title is claimed by prescription and adverse possession. Experts were introduced who had analyzed the cores to ascertain the quality of the limestone. These witnesses testified that the carbonate of lime averaged less than 96 per cent. A topographical map of the premises was admitted in evidence. Appellants did not confine their examinations to drillings. Trenches were dug, outcroppings exposed at various locations on said Lawrence county land were examined and analyzed, and the abandoned quarry was examined, as well as the present quarry. The experts for both parties agreed that, allowing for a dip of 1 per cent. known to exist in the stone strata of that region, the tops of the large bodies of magnesia stone as shown in the two drill holes

were at the proper elevations to indicate a continuance of the same bed. Samples were produced off the face of the present quarry, which showed a strata of magnesia stone averaging between 2 and 3 feet in thickness, which seems to have been the basis for the covenant as to the limit of thickness of dolomite. This strata corresponded in elevation with a band of dolomite of the same thickness shown in drill hole No. 3, which fact served to corroborate the evidence as to the extent of the bed of dolomite. Examinations showed that the beds of magnesia which were discovered constituted about 65 per cent. in thickness of the limestone deposit above the present top of the quarry. A number of witnesses were examined on the thickness of the dolomite deposit, and the evidence is voluminous, too much so to admit of recapitulation in detail here. The District Court was of the opinion that the evidence, under the terms of the contract, should be confined to the drillings, and admitted the other evidence offered as to the quality and quantity of the limestone simply that this court might have it before them, declining to consider the same himself.

It was shown by experts that it was essential to make surface and other tests and to take into consideration other facts in order to calculate the disclosures made by drilling, as, for instance, the established scientific facts with regard to the limestone deposit including the sedimentary origin—the dip of the different strata of rocks, the topography of the land, its elevations with regard to the exposed quarry face, which was in the Mitchell strata, and not the oolitic, and all other data which would assist in making calculations. Appellee introduced certain experts and others who testified that the amount of dolomite and the quantity and quality of limestone could only be arrived at by a large number of drillings, from 60 to 100, which would have cost about $1,000 per hole. While it is denied, the evidence seems to establish as a fact that appellee was advised of the methods pursued in making examinations and not to have objected thereto. It appears that the Mitchell formation of stone lies on top of the oolitic and above the level of the floor of the present quarry. Thus it appears that the entire deposit here involved was the Mitchell formation; i. e., 180 acres out of 204 acres of limestone. Several of appellee's witnesses were building stone quarrymen, and were experienced only in oolitic stone and their testimony must be read in the light of this fact. The former state geologist of Indiana, after testifying for appellee that the extent of the strata shown at drill holes was not demonstrated by the sinking of the two drill holes, conceded that, assuming the elevation and levels to be as testified by appellants' witnesses, the 30-foot band of dolomite or magnesia as shown in the two drill holes probably was continuous between the two holes, or about 2,600 feet. The said drilling tests were made on land 60 feet or more above the top of the present quarry, viz., 110 feet above the land of that quarry floor, which body contains strata of magnesia limestone over 30 feet thick on the average, it is claimed. It appears that appellee, when advised in writing of the rejection of said property, made no protest as to sufficiency of the tests, but suggested another proposition and agreed to refund the $25,000. Two witnesses testified to this as against the testimony of appellee. This evidence is supported by the correspondence. A telegram is in evidence in which appellee advised Gerstell that he had found rock adjacent to the quarry and was arranging to test it.

The court dismissed both the bill and cross-bill for want of equity. Appellants present a number of assignments of error which go to the action of the court upon the facts stated. Appellee assigns as error the dismissal of his counterclaim.

Addison C. Harris, of Indianapolis, Ind., and Louis H. Porter, of New York City, for appellants.

Ferdinand Winter, of Indianapolis, Ind., for appellee.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above). The main contentions here are: First, were appellants, under the facts as

stated, entitled to a decree for the $25,000 paid as earnest money to appellee, and to the sum paid out as expenses incurred in investigation of said title and the quality and quantity of the stone deposit on said land? and, if not, second, was appellee entitled to a decree of specific performance of said contract against appellants?

[1, 2] Without determining the legal effect of the facts set out, it is clear from the allegations of the bill and answer, considered in connection with the evidence, much of which is undisputed, that, while the title to premises in question is one that may be made good, and for defensive purposes may be shown to be good in appellee, it is not shown to be good and merchantable and free from all liens and incumbrances of record, nor by the abstracts furnished, nor in fact. The defects as set out are not such as could be cured by oral testimony. In order to make it a complete chain of title, legal proceedings would be necessary. Appellee insists that, because the abstract shows in regard to some of the parcels of land composing said tract that appellee claims under prescription titles covering more than 20 years, therefore the abstracts show said title to be good and merchantable. This we are unable to concede. Howe v. Coates, 97 Minn. 385, 107 N. W. 397, 4 L. R. A. (N. S.) 1170, 114 Am. St. Rep. 723; Fagan v. Hook, 134 Iowa, 381, 105 N. W. 155, 111 N. W. 981. It can hardly be claimed that there are no conditions under which that would not be the case. It would not be true as against an insane or idiotic person. Appellee himself undertook to cure some of the said defects, but ceased when notified that the title and conditions of the land were such that appellants declined to accept the property, as not complying with the terms of the contract. Undoubtedly a title by prescription is as high as any known to the law, but the facts upon which it is based should be legally established. We do not deem the title as shown to some of the tracts as merchantable or marketable, for the purposes of these proceedings, in the absence of the decree of some competent tribunal declaring the unrecorded and unestablished facts, such as competency of parties barred, open and adverse possession, and the like. Fagan v. Hook, supra; Gerstell v. Shirk, 210 Fed. 223, 225, 127 C. C. A. 41. The property in question being one plant, the rule of law that failure in title to any material part of the land releases appellants from the obligation to take it prevails. Ankeny v. Clark, 148 U. S. 345, 358, 13 Sup. Ct. 617, 37 L. Ed. 475.

[3] The contention of appellee that a good and merchantable title is established when an equitable title is tendered is without merit in the present case. The contract calls for a legal title, not one which could be made such by a lawsuit. An equitable title is not a merchantable title. Maupin on Marketable Titles to Real Estate (2d Ed.) page 731; Sugden on Vendors (14th Am. Ed.) vol. 1, p. 579; Murray v. Ellis, 112 Pa. 485, 3 Atl. 845; Day v. Mountin, 137 Fed. 756, 764, 70 C. C. A. 190. In Abel v. Heathcote, 2 Ves. Jr. 100, it was held that such a title would not sustain an action in ejectment. This is not a proceeding to establish title to the said property, and we are not charged with that task, but only to determine whether the title to said lands, and all of them, was at the date of the contract good

and merchantable, or became such within the periods prescribed or agreed on to that end. We are of the opinion that while, other things being satisfactory, appellants might have been safe in taking said title, yet it was not such a title as would support a suit for specific performance or be deemed a compliance with the terms of the contract on appellee's part.

[4] The far more vital questions, however, are those which pertain to the conditions of the lands involved as to the quality and quantity of the limestone contained therein with reference to the availability of the property for a Portland cement manufacturing plant. The justice of appellants' cause turns mainly upon the sufficiency of the examination made of the conditions there existing. Both parties seem to have entered honestly upon that undertaking, and not until a considerable lapse of time from the date written notice was served of appellants' refusal to take the land and perform the contract did appellee raise the contention that the tests made were inadequate. The parties were working together to ascertain the truth. The work had, under the contract, to be carried on during the winter months, when digging and drilling were difficult. While the contract required drilling, it did not exclude other methods, especially such as interpreted the results of the drilling—examination of outcroppings, digging of trenches, and any other steps which would throw light upon the subject. It is more than conceivable that identification of core materials with those shown in outcroppings, quarry faces, and shallow trenches would be almost indispensable aids in interpreting the significance of the strata revealed by the cores. Appellees' witness Blatchley, state geologist of Indiana, so testified, with others, and the proposition seems to be one of common knowledge, which should have had weight with the court. The proposition that there should have been drilled at least 60 holes does not appeal to reason. To expend $60,000 on drillings alone would make testings in such cases prohibitive. There seems to be plausibility in the corroborating data procured from the different methods used by appellants. Bands of dolomite and beds of limestone are traced in a satisfactory manner. Dolomite or magnesia limestone constitutes a part of the limestone deposit just as truly as pure calcium carbonate or practically pure limestone.

The contract warrants the limestone to contain 90 per cent. of carbonate of lime. This degree of purity is essential for successful operation of a Portland cement manufacturing plant. The evidence shows that a considerable part of the main bed of limestone averaged much less than 90 per cent.—some of it very much lower. It also shows that there was in places dolomite above the limestone 30 feet in thickness, and that the overburden exceeds 8 per cent. of the total height of the stone deposit above the level of the bottom of the present quarry. Appellee suggests that the dolomite is above and not in the limestone. The debased quality of the limestone indicates that the magnesia stone is in as well as over the limestone in many places. His contention that the contract does not refer to magnesia stone upon the limestone bed is not a reasonable construction of the contract. Even were it so, the burden of the material lying above the limestone far

exceeds the limitation fixed by the contract. Appellants sunk their drill holes at an elevation of over 60 feet above the top of the present quarry. If, as appellee contends, the contract refers only to the limestone strata at a depth of over 100 feet from the surface at the place where the drilling was done, not even down to the floor of the present quarry, appellee, who is shown to have been advised of what was being done by appellants, should and probably would not have allowed the drilling to have been made at that altitude. His action was inconsistent with his present position. We are convinced that there is a stone deposit on this land extending in thickness about 110 feet above the bottom of the present quarry and that therein are strata of magnesia limestone of an average aggregate thickness of over 30 feet, and that this stone in the overburden exceeds the proportions prescribed by the contract, and that the properties of the land are not such as the contract guarantees. The evidence as to the claim of appellants that appellee agreed to refund the $25,000 seems fairly well established. All the evidence considered, we are satisfied that appellants have maintained their bill and are entitled to a decree establishing and enforcing their vendee's lien in accordance with the former opinion of this court in Gerstell v. Shirk, 210 Fed. 223, 127 C. C. A. 41, to the amount of $25,000 and expenses as stated, with interest.

For the reasons stated, appellee is not entitled to any relief upon his counterclaim. The decree of the District Court in No. 2216 is reversed, with direction to enter a decree for appellants, and the decree in No. 2260 is affirmed.